IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

VICTORIA ELIZABETH BARBARA HILL,

Plaintiff,

v.

OREGON STATE HOSPITAL,
DR. HRISHIKESH IYENGAR and
DR. RUBINA GUNDROO, in their individual
capacities,

Defendants.

Case No. 6:19-cv-00409-SB

**OPINION AND ORDER**

**BECKERMAN, U.S. Magistrate Judge.**

Plaintiff Victoria Hill ("Hill"), an individual who, at all relevant times, was a pretrial

detainee and patient at Oregon State Hospital ("OSH"), filed this 42 U.S.C. § 1983 action against

OSH, Rubina Gundroo, M.D. ("Dr. Gundroo," and together with OSH, the "State Defendants"),

an OSH psychiatrist, and Hrishikesh Iyengar, M.D. ("Dr. Iyengar," and together with the State

Defendants, "Defendants"), a cardiologist whose medical group contracts with OSH.[1] Hill

alleges that Drs. Iyengar and Gundroo violated her right to adequate medical care under the due

---

[1] The Court directs the Clerk of Court to correct the docket to reflect the correct spelling
of Dr. Iyengar's first name to "Hrishikesh." (*See* Decl. Kim Hoyt Supp. Def. Iyengar's Mot.
Summ. J. ("Hoyt Decl.") Ex. 1 at 1, ECF No. 92 at 3.)

process clause of the Fourteenth Amendment, and asserts a claim for injunctive relief against OSH.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, and the parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636. For the reasons explained below, the Court grants Dr. Iyengar's and the State Defendants' motions for summary judgment.

## BACKGROUND[2]

On May 18, 2017, about a year and a half before she was admitted to OSH, Hill presented for a cardiothoracic surgery consultation at Oregon Health and Science University ("OHSU"). (Decl. Mark Passannante ("Passannante Decl.") Ex. 1 at 1-8, ECF No. 100-1; Decl. Kristi Hennan Supp. State Defs.' Mot. Summ. J. ("Hennan Decl.") ¶ 3, ECF No. 89.) Hill, who was twenty-nine years old at the time, reported a history of intravenous drug use and that she was "recently in prison and . . . likely . . . to go back" and "still smoking meth." (Passannante Decl. Ex. 1 at 2, 7.)

Based on his examination and review of Hill's records, Victor Rodriguez, M.D. ("Dr. Rodriguez"), agreed with his physician assistant that Hill was suffering from "symptoms of right sided heart failure" due to severe tricuspid regurgitation "secondary to prior tricuspid valve endocarditis." (*Id.* at 7-8.) Dr. Rodriguez advised Hill of her "high risk of getting [a] new valve re-infected," he would not replace a new valve, and if Hill's "tox screen [was] . . . negative[, he would] take her to the [operating room] on [May 23, 2017] for a [heart] valve replacement." (*Id.* at 8.)

---

[2] Unless otherwise noted, the Court recounts the following facts in the light most favorable to Hill, the non-moving party. *See Rice v. Morehouse*, 989 F.3d 1112, 1116 (9th Cir. 2021) ("The following facts were either undisputed at summary judgment or, if disputed, are recounted in the light most favorable to Rice, the non-moving party.").

PAGE 2 – OPINION AND ORDER

On May 22, 2017, Dr. Rodriguez noted that Hill "admitted to using methamphetamine the day before yesterday," he was "advising against operating" on Hill because it was "not safe," and Hill needed to be "completely off [m]ethamphetamine before [he] can propose surgery." (*Id.* Ex. 2 at 7.)

After being admitted to OSH on January 22, 2019, Hill had "a code blue event [on January 24, 2019,] after she reported feeling dizzy and became unresponsive for approximately one minute." (Passannante Decl. Ex. 3 at 12; Hennan Decl. ¶ 3.) Hill's x-ray and echocardiogram revealed "no remarkable findings," and OSH referred Hill "to cardiology." (Passannante Decl. Ex. 3 at 12.)

Hill presented for a cardiovascular consultation with Dr. Iyengar on February 11, 2019. (Hoyt Decl. Ex. 2 at 1-4, ECF No. 92 at 7-10.) Dr. Iyengar noted that Hill "carrie[d] a history of known infective endocarditis secondary to [intravenous] drug abuse," had been "evaluated for consideration of valve surgery which was never performed," and reported "multiple symptoms including palpitations, atypical chest pains, dizziness, [and] numbness in her mouth and face area." (*Id.* at 1.)

Hill received an echocardiogram that same day, which, according to Dr. Iyengar, revealed (1) "preserved left ventricular systolic function," (2) "[m]ild to moderate dilation of [the] right atrium [and the] right ventricle," (3) what "appear[ed] to be severe tricuspid regurgitation with inadequate coaptation of the tricuspid valve leaflets which could have been damaged secondary to [the] prior history of endocarditis," and (4) "[n]o clear evidence of valvular vegetation[.]" (*Id.*) Dr. Iyengar added that Hill had "been clean of intravenous drugs at least for the last [six to eight] months," Hill had "denie[d] any compelling symptoms of orthopnea or right heart failure," "[s]ymptomatically, [there was] no clear evidence of congestive heart failure," and despite

PAGE 3 – OPINION AND ORDER

"evidence of severe tricuspid regurgitation with dilation," Hill's reports of "atypical chest pain and numbness involving her face [could not] be adequately explained by her echo findings." (*Id.* at 3.) Thus, Dr. Iyengar concluded that he "would consider [an] alternative evaluation for [Hill's atypical symptoms]." (*Id.*) Dr. Iyengar added that Hill should present for a follow-up in May 2019. (*Id.*)

On February 14, 2019, an OSH nurse noted that Hill's "episodes of feeling dizzy ha[d] decreased," Hill's attendance at treatment classes "continue[d] to increase," Hill continued to complain of chest pain but had "not had any episodes of dizziness and hypotension," and Hill stated that she did "not understand why it [was] taking so long to schedule [her] surgery [and felt that] her condition [was] going to worsen if left untreated." (Passannante Decl. Ex. 3 at 1-2.) Later that month, Hill continued to report "episodes of chest . . . pain and numbness that radiate[d] from [her] chest to [her] arms, face, and jaw," and reported swelling but "no edema was noted." (*Id.* at 5.) A nurse checked Hill's vital signs multiple times and they were within normal limits. (*Id.*)

On March 1, 2019, Hill reported that she was "not feeling well at times," had "episodes of chest pain that radiate[d] from [her] chest to [her] arms, face, and jaw," and experienced pain, numbness, and tingling "all over." (*Id.* at 9.) A nurse noted that Hill's vital signs continued to be within normal limits, staff encouraged Hill to "restrict her exercise intensity to moderate to avoid overexertion" and "use the elevator," OSH was obtaining Hill's medical records from OHSU, OSH had scheduled Hill a follow-up visit with Dr. Iyengar on March 25, 2019, and Hill "remain[ed] delusional regarding a chip being implanted in her ear by the Coos County jail." (*Id.* at 9-11.)

///

PAGE 4 – OPINION AND ORDER

On March 6, 2019, Hill visited "Dr. Logan in the OSH medical clinic," who referred Hill

to OHSU for further consultation and care regarding her "tricuspid valve insufficiency" and

cardiothoracic surgery. (*Id.* at 13.) The next day, a nurse noted that Hill continued to complain of

numbness, tingling, and chest pain, but had no difficulties completing her daily activities. (*Id.* at

13-15.)

During her follow-up visit on March 25, 2019, Dr. Iyengar noted that many of Hill's

"somatic symptoms ha[d] no cardiac correlation" and "[c]linically, there [was] no objective

evidence of decompensated right or left heart failure" or orthopnea. (Hoyt Decl. Ex. 3 at 1, 3,

ECF No. 92 at 11, 13.) Although he did "not see a clinical indication at [that] time for offering

[Hill] surgical correction of the tricuspid valve," Dr. Iyengar noted that Hill was "clear that she

wishe[d] to obtain a referral to OHSU for [surgery] and [he would] try and facilitate that." (*Id.* at

3.)

The next month, on April 25, 2019, Hill presented for a consultation with Frederick

Tibayan, M.D. ("Dr. Tibayan"), at OHSU. (Passannante Decl. Ex. 4 at 2.) Hill reported that she

had been "working out more on the treadmill" and experiencing "worsening shortening of

breath," and continued to have chest pain and numbness, some of which was "from when she

was ta[s]ered." (*Id.*) After discussing that Hill was "at risk for [c]ongestive [h]eart [f]ailure in the

future," and the risks and benefits of heart surgery, Dr. Tibayan and Hill elected to proceed with

surgery in mid-May 2019. (*Id.* at 1, 6; *id.* Ex. 5 at 1; Hoyt Decl. Ex. 4 at 20-21, ECF No. 92 at

34-35.)

According to Kristi Hennan, M.D. ("Dr. Hennan"), OSH's head of medicine who

supervises "contracting and employee physicians," OSH's scheduling department needed

Dr. Hennan's approval before proceeding with an outside specialist's request to perform certain

PAGE 5 – OPINION AND ORDER

procedures or surgeries, such as Hill's heart valve replacement. (Hennan Decl. ¶ 1; Hoyt Decl.

Ex. 9 at 2-6, ECF No. 92 at 77-81.) Dr. Hennan reviewed Hill's medical records and, at some

point before May 16, 2019, Dr. Tibayan's physician assistant returned Dr. Hennan's call. (Hoyt

Decl. Ex. 9 at 5-10.) The physician assistant informed Dr. Hennan that Hill's heart surgery was

"elective." (*Id.* at 7.)

On May 16, 2019, Dr. Hennan entered a note in Hill's file stating that she canceled Hill's

heart valve replacement surgery because it was elective, and Hill would follow up every three

months or "sooner if signs of heart failure develop," i.e., signs that the heart was "not

compensating as well for the injured valve" or "more fluid [was] backing up." (*Id.* Ex. 5 at 1; *id.*

Ex. 9 at 12.) Dr. Hennan also informed Hill's OSH psychiatrist, Dr. Gundroo. (*Id.* Ex. 5 at 1; *id.*

Ex. 9 at 11.)

On August 22, 2019, Hill presented for a follow-up visit with Dr. Tibayan. (Passannante

Decl. Ex. 10 at 2.) Hill reported that she was "feeling poorly," she was "tired all the time," she

was "feeling more swollen," her ankles were swelling, she had "very little strength," she wanted

to "work out and get stronger but [was] too fatigued," and she had "intermittent [left] facial and

[left upper extremity] numbness." (*Id.*) Hill added that she had "completed her [recommended]

dental care [with] several extractions and [was] now cleared for surgery from this standpoint."

(*Id.*)

One week later, on August 29, 2019, Dr. Tibayan called to discuss Hill's case with

Dr. Hennan. (Hoyt Decl. Ex. 7 at 1; *id.* Ex. 9 at 13-14.) According to Dr. Hennan, Dr. Tibayan

stated that Hill's "increasing subjective symptoms warrant[ed] moving forward with surgery."

(*Id.* Ex. 7 at 1; *id.* Ex. 9 at 13-14.) Dr. Hennan therefore approved Hill's heart valve replacement

surgery. (*Id.*)

Hill presented for a pre-operative consultation at OHSU on September 18, 2019. (*Id*. Ex. 11 at 1.) A nurse practitioner noted that Hill had been diagnosed with tricuspid valve disease, Hill's surgery was set for September 23, 2019, there was "no shortness of breath" and "no chest pain," and Hill had been "[d]oing work outs at [her] facility" and "[w]alking up [three] flights of stairs several times/day." (*Id*. at 1-2.) The nurse's "overall assessment" was that Hill was "having elective major surgery with identified risk factors," and "stable/optimized for surgery." (*Id*. at 6; *see also* Hennan Decl. Attach. 1 at 1, referring to Hill's OHSU admission type as "[e]lective [s]urgical").

Hill underwent heart valve replacement surgery at OHSU on September 23, 2019. (Hennan Decl. ¶ 4.) Due to post-surgery complications while at OHSU, Hill had a pacemaker installed on October 1, 2019. (*Id*. ¶ 5; *id*. Attach. 1 at 3-4, describing Hill's re-admission to the cardiovascular intensive care unit "with symptomatic bradycardia necessitating epicardial pacing").

Thereafter, Hill received follow-up care at OHSU and OSH. (*Id*. ¶ 6; Passannante Decl. Ex. 12 at 5-6.) During the initial stage of her post-surgery recovery at OSH, Hill reported lightheadedness and nearly passing out and needed to be transported to Salem Hospital, where she was diagnosed with a slow heart rate and "malfunctioning" pacemaker and had her pacemaker adjusted to resolve her slow heart rate. (Passannante Decl. Ex. 12 at 5-6; Hennan Decl. ¶ 6.) Hill also complained of incisional pain and inadequate pain medication, but denied worsening shortness of breath and reported that she had been active and walking multiple laps around the track. (Hennan Decl. ¶ 6.) Hennan testified that in her "professional opinion and to a reasonable medical certainty," Hill has received adequate pain management, pain medication that

is "safe for a patient with heart disease," and "appropriate post-operative care and rehabilitative services as appropriate." (*Id.* ¶ 7.)

## LEGAL STANDARDS

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). At the summary judgment stage, the court views the facts in the light most favorable to the non-moving party, and draws all reasonable inferences in favor of that party. *See Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005). The court does not assess the credibility of witnesses, weigh evidence, or determine the truth of matters in dispute. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## DISCUSSION

### I.    FOURTEENTH AMENDMENT CLAIMS

Drs. Iyengar and Gundroo argue that they are entitled to summary judgment on Hill's claims for inadequate medical care under the Fourteenth Amendment. (Def. Iyengar's Mot. Summ. J. ("Iyengar's Mot.") at 2, 6-7, ECF No. 87; State Defs.' Mot. Summ. J. ("State Defs.' Mot.") at 1-2, 7, ECF No. 88.) For the reasons explained below, the Court grants Drs. Iyengar's and Gundroo's motions because no reasonable juror could conclude based on this record that Drs. Iyengar and Gundroo were deliberatively indifferent to Hill's medical needs.

#### A.    Applicable Law

The Ninth Circuit has explained that a pretrial detainee who brings an inadequate medical care claim must satisfy four elements:

[(1)] the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;

[(2)] those conditions put the plaintiff at substantial risk of suffering serious harm;

[(3)] the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and

[(4)] by not taking such measures, the defendant caused the plaintiff's injuries.

*Russell v. Lumitap*, 31 F.4th 729, 738 (9th Cir. 2022) (quoting *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2017)).

Under this "objective deliberate indifference standard," *Gordon*, 888 F.3d at 1125, "a defendant can be liable even if he did not actually draw the inference that the plaintiff was at a substantial risk of suffering serious harm, so long as a reasonable official in his circumstances would have drawn that inference." *Russell*, 31 F.4th at 738; *see also Herrera v. L.A. Unified Sch. Dist.*, 18 F.4th 1156, 1159 (9th Cir. 2021) ("The deliberate indifference inquiry in [the pretrial detainee] context is set out in the third prong[.]" (citing *Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1070 (9th Cir. 2016) (en banc)); *Gordon*, 888 F.3d at 1125 (noting that the "test" under the "third element" is whether the official's conduct was "objectively unreasonable" (quoting *Castro*, 833 F.3d at 1071)).

In other words, to satisfy "this objective [deliberate indifference] standard, a plaintiff must 'prove more than negligence but less than subjective intent—something akin to reckless disregard.'" *Russell*, 31 F.4th at 739 (quoting *Gordon*, 888 F.3d at 1125). A plaintiff must also prove something more than medical malpractice or a difference of opinion concerning the course of treatment. *See Saddozai v. Bolanos*, No. 20-16862, 2022 WL 501124, at *1 (9th Cir. Feb. 18, 2022) (addressing a pretrial detainee's inadequate medical care claim and noting that "medical malpractice, negligence, or a difference of opinion concerning the course of treatment does not

PAGE 9 – OPINION AND ORDER

amount to deliberate indifference" (citing *Toguchi v. Chung*, 391 F.3d 1051, 1057-60 (9th Cir. 2004))).

### B.    Analysis

Hill fails to raise a genuine dispute of material fact as to whether Drs. Iyengar's and Gundroo's conduct in the course of treating her was objectively unreasonable, or amounted to negligence, medical malpractice, or something more than a difference of opinion concerning the course of treatment. The Court therefore grants Drs. Iyengar's and Gundroo's motions for summary judgment. *See Buchanan v. Ahern*, 859 F. App'x 785, 786 (9th Cir. 2021) ("The district court properly granted summary judgment on [the] Fourteenth Amendment inadequate medical care claims because [plaintiff] failed to raise a genuine dispute of material fact as to whether any defendant's conduct in the course of treating [him] was objectively unreasonable").

### 1.    Dr. Iyengar

As an initial matter, Dr. Iyengar disputes whether he is a state actor for the purpose of a Section 1983 claim. (Iyengar's Mot. at 7-11.) The Court need not reach the issue of whether Dr. Iyengar is a state actor, because Hill has failed to raise a genuine dispute of material fact as to whether Dr. Iyengar's conduct was objectively unreasonable here.

Even when the Court views the record in the light most favorable to Hill, no reasonable juror could conclude that Dr. Iyengar's conduct amounted to negligence, medical malpractice, or something more than a difference of medical opinion concerning the course of treatment. The record reflects that at all relevant times, Hill's medical providers referred to her surgery as "elective." (*See* Hoyt Decl. Ex. 9 at 5-10; *id.* Ex. 11 at 6; Hennan Decl. Attach. 1 at 1.) Further, nothing in the record suggests that Dr. Iyengar was objectively unreasonable in reviewing Hill's echocardiograms and self-reports, and in turn concluding that (1) many of Hill's "somatic symptoms ha[d] no cardiac correlation," (2) "[c]linically, there [was] no objective evidence of

PAGE 10 – OPINION AND ORDER

decompensated right or left heart failure" or orthopnea, (3) "[s]ymptomatically, [there was] no

clear evidence of congestive heart failure," (4) there was not a "clinical indication at [the] time

for offering [Hill] surgical correction of the tricuspid valve," and (5) Hill's reports of "atypical

chest pain and numbness involving her face [could not] be adequately explained by her echo

findings." (Hoyt Decl. Exs. 2-3.)

After Hill visited Dr. Tibayan on August 22, 2019, several months after Dr. Iyengar's last

consultation, Dr. Tibayan called Dr. Hennan back and recommended proceeding with surgery.

(Passannante Decl. Ex. 10 at 2; Hoyt Decl. Ex. 7 at 1; *id.* Ex. 9 at 6-14.) Notably, however, the

record reflects that Dr. Tibayan's recommendation to proceed with surgery was based on Hill's

reports of "increasing subjective symptoms," "not objective findings."[3] (Hoyt Decl. Ex. 7 at 1;

*id.* Ex. 9 at 14.) There is also nothing in the record, such as an expert medical opinion, that would

support a conclusion that Hill's increasing self-reports and eventual need for a pacemaker was

the result of a few-month delay in surgery.

For these reasons, Dr. Iyengar is entitled to summary judgment on Hill's Fourteenth

Amendment claim.[4] *See Saddozai*, 2022 WL 501124, at *1 (holding that "[t]he district court

properly granted summary judgment because . . . [the plaintiff] failed to raise a genuine dispute

---

[3] Hill emphasizes that OHSU never recommended canceling the surgery in May 2019. (Combined Resp. Defs.' Mots. ("Pl.'s Resp.") at 8-9, ECF No. 96.) However, nothing in the record contradicts Dr. Hennan's testimony that Hill's surgery was elective, and that Dr. Tibayan informed Dr. Hennan that Hill's increasing self-reports, not objective evidence, warranted moving forward with the surgery in September 2019.

[4] Dr. Iyengar also argues that Hill cannot prove a negligence claim against him (*see* Iyengar's Mot. at 13-14), but Hill did not plead a negligence claim. (*See* Am. Compl. at 1-6; Pl.'s Resp. at 7-8.)

of material fact as to whether defendants were deliberately indifferent in responding to his

[medical] complaints").[5]

### 2.    Dr. Gundroo

Hill bases her Fourteenth Amendment claim against Dr. Gundroo on the theory that

despite Hill's objections and reports of side effects, Dr. Gundroo continued to prescribe mental

health medications that were "bad for [Hill's] heart condition" and caused Hill to "have suicidal

thoughts" and suffer from "increased fatigue and chest pain," "breathing difficulties," "an

elevated heartbeat and numbness," headaches, and body pain. (Am. Compl. ¶ 10; Pl.'s Resp. at

6.)

The record reflects that Dr. Gundroo prescribed mental health medications for Hill

because throughout the period at issue, Hill "continued to experience symptoms of psychosis"

and complained about a "conspiracy" and "a device . . . [being] implanted in her ears [in Coos

County, which allowed] people [to be] able to hear her and monitor her actions." (Passannante

Decl. Ex. 12 at 2-3; *id.* Ex. 3 at 1-16.) The record also reflects that Dr. Gundroo discontinued

each of the mental health medications about which Hill complained within a few weeks or

months, before trying a different medication. (*Id.* Ex. 12 at 2-3; *see also id.* Ex. 3 at 4,

---

[5] Hill requests leave to amend her complaint to plead a Fourteenth Amendment claim
against Dr. Hennan for the first time (Pl.'s Resp. at 10), but the deadline to amend pleadings
expired almost two years ago. (*See* ECF No. 70.) Hill makes no attempt to establish good cause
to modify the Court's scheduling order, and the Court finds no good cause to amend the
pleadings, especially following the expiration of the discovery and dispositive motion deadlines.
*See* FED. R. CIV. P. 16(b)(4) ("A schedule may be modified only for good cause and with the
judge's consent."); *see also Wasco Prods., Inc. v. Southwall Tech., Inc.*, 435 F.3d 989, 992 (9th
Cir. 2006) ("Simply put, summary judgment is not a procedural second chance to flesh out
inadequate pleadings."); *Mitchell v. Homesales, Inc.*, No. 3:13-cv-00665-SI, 2014 WL 1744991,
at *4 n.5 (D. Or. Apr. 30, 2014) (declining to consider a violation of a different subsection of a
statute, and noting that the plaintiff could not allege a new cause of action in response to a
motion for summary judgment and that "summary judgment is not a procedural second chance to
flesh out inadequate pleadings") (citations omitted).

confirming that Dr. Gundroo discontinued Seroquel, also known as quetiapine, on February 19, 2019; State Defs.' Mot. Attach. 2 at 7, noting that Hill reported that she had "tried Seroquel in the past").

Further, the record reflects that Hill had the option to, and often did, decline to take the medications that Dr. Gundroo prescribed. (State Defs.' Mot. Attach. 2 at 12, ECF No. 88-2; Passannante Decl. Ex. 12 at 2-3; *id.* Ex. 3 at 1-16.) Although Hill complains that Dr. Gundroo suggested that Hill stabilize her mental health before undergoing surgery, there is no evidence in the record that Dr. Gundroo delayed her surgery because she refused to take her mental health medications. (*See* State Defs.' Mot. Attach. 2 at 21-23, reflecting that Dr. Gundroo did not have "any input on the decision to refer [Hill] to surgery").

Finally, the record does not include any medical evidence suggesting that Hill's use of the medications Dr. Gundroo prescribed damaged Hill's heart, resulted in a deterioration of Hill's heart condition, or caused her reported symptoms. (*Cf.* Passannante Decl. Ex. 4 at 2, reflecting that Hill had been "working out more on the treadmill" and experiencing "worsening shortening of breath," and continued to have chest pain and numbness, some of which was "from when she was ta[s]ered"; *id.* Ex. 3 at 9-11, reflecting that an OSH nurse advised Hill to "restrict her exercise intensity to moderate to avoid overexertion" and "use the elevator"; *id.* Ex. 11 at 2-3, noting "no shortness of breath" and "no chest pain," and that Hill had been "[d]oing work outs at [her] facility" and "[w]alking up [three] flights of stairs several times/day"; State Defs.' Mot. Attach. 2 at 10-11, reflecting that Seroquel poses "no specific risk to treating patients who have a heart condition like [Hill's]" and despite reports of fatigue, Hill "always seemed to be very active," was "very engaged in activities . . . with her peers," and "liked to go out to the gym and engage in fitness activities").

PAGE 13 – OPINION AND ORDER

On this record, no reasonable juror could find that Dr. Gundroo was deliberately

indifferent to Hill's medical needs. Accordingly, the Court grants Dr. Gundroo's motion for

summary judgment on Hill's Fourteenth Amendment claim.

## II.    INJUNCTIVE RELIEF

In addition to the Fourteenth Amendment claims addressed above, Hill's amended

complaint also includes a separate claim for injunctive relief requiring OSH to, among other

things, provide her with post-surgery rehabilitative care. (Am. Compl. ¶¶ 15-19.) In light of the

Court's entry of summary judgment for Drs. Iyengar and Gundroo on Hill's Fourteenth

Amendment claims (i.e., finding no constitutional violations), the Court also grants the State

Defendants' motion for summary judgment on Hill's claim for injunctive relief.[6] *See Gonzalez v.*

*Lam*, No. 18-cv-07508, 2020 WL 5094835, at *9 n.5 (N.D. Cal. Aug. 28, 2020) ("The Court's

finding that Defendant is entitled to summary judgment as a matter of law as to Plaintiff's Eighth

Amendment claim obviates the need to address Defendant's alternative arguments in his

dispositive motion based on . . . the mootness of the request for injunctive relief[.]"), *aff'd*, No.

20-16876, 2021 WL 6102093, at *1 (9th Cir. Dec. 22, 2021) ("The district court properly granted

summary judgment because Gonzalez failed to raise a genuine dispute of material fact as to

whether defendant Lam was deliberately indifferent to Gonzalez's [medical] complaints[.]").

///

///

---

[6] The Court also finds that Hill's claim for injunctive relief requiring OSH to provide her with valve replacement surgery and post-surgery care is moot because she already received the surgery, and because she no longer resides at OSH. To the extent Hill seeks payment from OSH for future rehabilitative services (Am. Compl. at 6), "[u]nder the Eleventh Amendment of the United States Constitution, the State of Oregon and its instrumentalities, such as OSH, are immune from suits seeking damages in federal court." *Moret v. Or. State Hosp.*, No. 6:18-cv-01105-MK, 2021 WL 1940199, at *1 (D. Or. Apr. 12, 2021) (citations omitted), *findings and recommendation adopted*, 2021 WL 1928535, at *1 (D. Or. May 12, 2021).

## CONCLUSION

For the reasons stated, the Court GRANTS Dr. Iyengar's motion for summary judgment

(ECF No. 87) and GRANTS the State Defendants' motion for summary judgment (ECF No. 88).

**IT IS SO ORDERED.**

DATED this 7th day of February, 2023.

_____
HON. STACIE F. BECKERMAN
United States Magistrate Judge

PAGE 15 – OPINION AND ORDER